UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**BRIAN M.,**

**Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL**
**SECURITY,**

**Defendant**.

Case No. 1:20-cv-001713-TPK

OPINION AND ORDER

## OPINION AND ORDER

    Plaintiff filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security.  That final decision, issued by the Appeals Council on September 29, 2020, denied Plaintiff's applications for disability insurance benefits and supplemental security income.  Plaintiff has now moved for judgment on the pleadings (Doc. 7), and the Commissioner has filed a similar motion (Doc. 9).  For the following reasons, the Court will **GRANT** Plaintiff's motion, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

### I.  BACKGROUND

    On September 8, 2017, Plaintiff protectively filed his applications for benefits, alleging that he became disabled on May 1, 2017.  After initial administrative denials of his claim, Plaintiff appeared at an administrative hearing held on December 12 , 2019.  Plaintiff and a vocational expert, Timothy P. Janikowski, testified at that hearing.

    The Administrative Law Judge issued an unfavorable decision on December 31, 2019. He first concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017, and that he had not engaged in substantial gainful activity since his application date.  Next, he found that Plaintiff suffered from severe impairments including osteoarthritis of the left ankle, foot, and right knee, hallux valgus of the left foot, posterior tibial tendinitis of the left leg, polyarthropathy, hyperuricemia, idiopathic neuropathies, obesity, and a right hand and finger impairment.  He further determined that Plaintiff's impairments, viewed singly or in combination, and whether severe or nonsevere, were not of the severity necessary to qualify for disability under the Listing of Impairments.

    Moving on to the next step of the inquiry, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level.  However, he could only frequently push, pull, handle, finger and feel with the right, dominant hand, he could not do work

with vibratory tools, he could not balance on uneven ground or terrain, he could not climb ropes, ladders, and scaffolds, and he could not work around unprotected heights. The ALJ next determined that Plaintiff, with these limitations, could do his past relevant work as a pharmaceutical inspector or quality control analyst. The ALJ therefore concluded that Plaintiff was not under a disability as defined in the Social Security Act.

Plaintiff, in his motion for judgment, raises two issues. He argues that the ALJ improperly evaluated a treating source opinion and that the ALJ's residual functional capacity determination was not supported by substantial evidence.

## II.  THE KEY EVIDENCE

The Court will begin its review of the evidence by summarizing the testimony from the administrative hearing. It will then provide a summary of the most important medical records.

### A.  The Hearing Testimony

Plaintiff, who was 59 years old as of the date of the hearing, first testified that he had lived with his mother for the past ten years and was assisting her due to her health issues. He was able to drive and took his mother to medical appointments. He also did chores and went grocery shopping.

When asked about his education, Plaintiff said that he had an associate's degree in chemistry. His last job was as a quality control analyst for a pharmaceutical company, a job that ended when his employer moved its business operations to Canada. He then drew unemployment for a year. Plaintiff had not seen a doctor between 2012, when he stopped working, and May of 2017. He said that he was experiencing problems with his hand and feet at that time. More recently, he had been treated for gout. Plaintiff experienced pain when he was active, such as when he mowed the lawn or climbed stairs. His job had required him to be on his feet all day. He now used a walking boot if he had to do prolonged walking.

In an eight-hour day, Plaintiff said that he could stand for an hour and a half and could sit for three hours. He could lift a little less than fifty pounds and also had problems with prolonged writing or typing. His left foot issue, which included neuropathy, caused some balance problems. Plaintiff testified that he could no longer work due to instability in his left foot and ankle.

The vocational expert, Timothy Janikowski, said first that Plaintiff's work could be described as inspector in the pharmaceutical industry, a job usually performed at the light exertional level. He was then asked questions about a person with Plaintiff's vocational profile who could work at the light exertional level but who had some restrictions in his ability to push, pull, handle, finger, and feel, and who also needed to avoid certain workplace hazards. The expert responded that such a person could do Plaintiff's past work as it was typically performed. Wearing a boot when walking would not interfere with the performance of that job, but having to

alternate between sitting and standing every hour would.  A worker would also have to be on task between 85% and 90% of the time and miss no more than one day per month.  Lastly, if the person were limited to only occasional use of his dominant hand, he could not do that job.

### B. The Relevant Medical Records

On May 5, 2017, Plaintiff was seen by a nurse practitioner at InvisionHealth.  He reported significant joint pain but walked with a normal gait and had normal posture.  Lab work and other tests were ordered.  X-rays showed some mild degenerative changes in the right and left hands and marked narrowing of the medial and lateral compartments of the right knee joint.  He reported at the next visit that he was doing well.  On his third visit, he was examined by Dr. Michalski, and reported pain in his hands as well as the loss of flexion in his fingers.  He also said that his right knee and ankle had been sore for many years.  He was taking naproxen sodium as needed.  On examination, Plaintiff's ankles were swollen and his subtabular joint motion on both sides was poor.  Dr. Michalski diagnosed inflammatory polyarthropathy.  Additional x-rays showed abnormalities in both ankles but nothing in the right shoulder.  In September, he had an effusion in his left knee and reported problems with prolonged standing.

There are additional treatment notes from Dr. Michalski in 2018.  Plaintiff continued to report pain in his left ankle from prolonged walking and he said his right shoulder hurt every day.  Dr. Michalski diagnosed osteoarthritis of both ankles and feet as well as unilateral primary osteoarthritis of the right knee.  He then saw Dr. Giglio for evaluation of his ankle and knee pain and told Dr. Giglio that lifting, walking, and kneeling made his pain worse.  He continued to have joint pain and swelling during that year and Dr. Michalski changed his diagnoses to idiopathic gout of the right knee and other hereditary and idiopathic neuropathies.  Throughout these visits, Dr. Michalski noted that Plaintiff was unable to make a fist with his right hand.  Also in 2018, he noted that Plaintiff had been prescribed a cam boot and a cane to assist him with walking.  Notes from 2019 indicate that Plaintiff was regularly taking his medication but was still having pain.

Plaintiff saw Dr. Gurske-dePerio on June 18, 2018 for further evaluation of his left foot and ankle pain.  X-rays taken as part of that examination did show some abnormalities in the left foot and ankle consistent with arthritis or gout.  The diagnoses made at that time included left foot posterior tibial tendinitis and left foot hallux valgus.  Dr. Gurske-dePerio discussed surgical options with Plaintiff but he elected for nonoperative treatment.  She saw him again in August and he had been wearing the boot but still complained of pain with activity and prolonged walking.

### C. Expert Opinions

Plaintiff underwent a consultative internal medicine examination on December 13, 2017, performed by Dr. Schwab.  Plaintiff's chief complaints were pain in his left ankle, pain in his right knee, and pain in his right hand.  He also suspected that he had gout.  Plaintiff said his routine activities included cooking, shopping, showering, watching television, listening to the

radio, and socializing with friends.  On examination, he walked with a normal gait, could do a full squat, and had no problems getting on and off the examination table.  He had a full range of motion of both the cervical and lumbar spines as well as in his major joints.  His left elbow and ankle were mildly tender and his had and finger dexterity was intact.  Dr. Schwab diagnosed gout affecting the ankle, knee, elbow, and hand, and thought that Plaintiff had no physical restrictions.  (Tr. 331-33).

Plaintiff's treating physician, Dr. Michalski, completed a medical source statement on December 4, 2019.  He had been treating Plaintiff since June of 2017 for gout and osteoarthritis which, due to pain, affected Plaintiff's ability to stand and walk and to use his fingers.  It also affected his ability to deal with job stress.  Dr. Michalski believed that Plaintiff could sit for more than two hours at a time but walk only ten minutes at a time, with his walking and standing limited to less than two hours per day.  He also had to alternate between sitting and standing at will, had to use an assistive device while walking, and could frequently lift ten pounds or less.  Dr. Michalski also identified various postural restrictions, limitations in overhead reaching, and the need to miss four or more days of work per month.  (Tr. 392-98).

Finally, a state agency physician, Dr. Miller, who reviewed records created on or before February of 2018, concluded that Plaintiff was limited to the performance of light work activities and could only frequently manipulate objects with his right hand.  (Tr. 93-96).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted);

*see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

## IV.  DISCUSSION

### A.  Treating Physician Opinion

As his first claim of error, Plaintiff argues that the ALJ did not properly evaluate Dr. Michalski's opinion.  The ALJ reasoned that Dr. Michalski's opinion was not consistent with his own treatment notes nor with Plaintiff's activities of daily living.  Plaintiff asserts that this reasoning involves a mischaracterization of the record concerning both of these sources of information.  The Commissioner, on the other hand, contends that the ALJ properly relied on inconsistent evidence in deciding to give little weight to Dr. Michalski's conclusions.

The ALJ had this to say about Dr. Michalski's opinion:

> Dr. Michalski's opinion is not persuasive as it is not consistent with his own treatment notes.... Dr. Michalski finds limitation with respect to claimant's cervical spine that are not supported by any clinical findings.  Similarly, his opinion as to the claimant's manipulative limitations (no ability to handle and only 50% ability to finger) are not consistent with the claimant's admitted activities of cooking, cleaning, driving, fishing, playing cards, handling paper money and helping to care for his mother.  (Tr. 16).

Because Plaintiff's applications were filed after March 17, 2017, his claim is subject to the current regulations concerning an ALJ's evaluation of expert opinions.  As this Court has said,

> Under these new regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)[,] ... including those from [a claimant's] medical sources." [20 C.F.R. Part 404] at §§ 404.1520c(a), 416.920c(a); *accord Harry B. v. Comm'r of Soc. Sec.*, 2021 WL 1198283, *6 (N.D.N.Y. 2021) ("[a]ccording to the new regulations, the Commissioner will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion") (quotations omitted); *Rivera v. Comm'r of Soc. Sec. Admin.*, 2020 WL 8167136, *14 (S.D.N.Y. 2020) ("the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion") (citation omitted), report and recommendation adopted by, 2021 WL 134945 (S.D.N.Y. 2021). "Instead, an ALJ is now obligated to evaluate the persuasiveness of 'all of the medical opinions' based on the same general

criteria: (1) supportability; (2) consistency with other evidence; (3) the source's relationship with the claimant; (4) the source's area of specialization; and (5) other relevant case-specific factors 'that tend to support or contradict a medical opinion or prior administrative medical finding.' " *Amanda R. v. Comm'r of Soc. Sec.,* 556 F. Supp. 3d 145, 154 (N.D.N.Y. 2021) (footnote omitted) (quoting 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5)).

*Wilbert D. v. Comm'r of Soc. Sec.*, 2022 WL 3320826, at *3 (W.D.N.Y. Aug. 11, 2022)**.**

     Here, the ALJ was not overly generous in his description of why he perceived an inconsistency between Dr. Michalski's treatment notes and his opinion about Plaintiff's physical capabilities. In fact, the only conflict he pointed out in this area (leaving aside, for the moment, the inconsistencies he saw between the opinion and Plaintiff's activities of daily living) dealt with restrictions in Plaintiff's ability to look up and down, turn his head, and hold his head in a static position. As the ALJ noted, the treatment records do not show any problems with the cervical spine, and Plaintiff did not complain about neck pain. Plaintiff correctly points out, however, that the form completed by Dr. Michalski showed "frequent" as the least restrictive level of activity in these areas, and that is what Dr. Michalski checked. Dr. Michalski also did not describe any neck problems in the areas of the form which called for narrative answers. The only reasonable interpretation of this form is that Dr. Michalski did not intend to restrict Plaintiff in the use of his neck, and to use the way he completed that part of the form as a reason for discounting his opinion as to other restrictions is simply not supportable on this record.

     The Commissioner devotes a good deal of argument to the issue of whether the manipulative restrictions contained in Dr. Michalski's opinion are consistent either with his notes (something the ALJ did not address) or with the activities of daily living highlighted in the ALJ's decision. It is true that Dr. Michalski stated that Plaintiff was unable to use either hand for grasping, turning, twisting, or fine manipulation, while Plaintiff did describe activities which involved those activities. Whether he could do them for a significant percentage of a work day is a different question, however. The treatment notes indicate that Plaintiff consistently reported symptoms relating to the use of his hands, including the inability to close his right hand, and that objective evidence showed a deformity there. Dr. Miller, who did not have the benefit of several years' worth of Dr. Michalski's notes, opined that Plaintiff had limits on his ability to manipulate with his right hand, but he did not describe in any detail the extent of those limits. The ALJ restricted Plaintiff to frequent use of his right (dominant) hand, meaning that he found Plaintiff was able to push, pull, handle, finger, and feel with that hand for up to two-thirds of the workday. It is not clear what evidence supports such a finding, especially since the ALJ found the consultative examiner's opinion not to be persuasive in light of the subsequent medical evidence.

     Beyond that, Dr. Michalski limited Plaintiff in his ability to stand and walk in way that is not consistent with the performance of light work. Again, the record shows that Plaintiff consistently reported pain in his knees, ankles, and feet; that there was objective evidence, including x-ray findings, to support his complaints; and that Dr. Michalski treated these

conditions and also referred Plaintiff to other physicians for further evaluation of them. He also prescribed a walking boot, which Plaintiff used on a consistent basis, but not without experiencing pain from prolonged walking or standing.

The vocational expert testified that Plaintiff's past work, as typically performed, would require him to be on his feet for up to six hours a day, and although he would be able to wear his boot when walking or standing, there is little evidence to rebut Dr. Michalski's conclusion that Plaintiff could not tolerate that amount of walking or standing. Certainly, the ALJ cited none, either from the treatment notes or from Plaintiff's activities of daily living. Although he did rely on Dr. Miller's conclusions, those were made without the benefit of either a large number of subsequent treatment records or the chance to review the treating physician's opinion. The ALJ also did not acknowledge the long-term treating relationship between Plaintiff and Dr. Michalski. All of this supports the conclusion that the ALJ did not properly apply the five relevant regulatory factors to his evaluation of Dr. Michalski's opinion, and a remand for further proceedings is therefore necessary to correct this error.

### B.  Residual Functional Capacity Finding

Plaintiff's second claim of error deals with the ALJ's residual functional capacity finding, which, Plaintiff contends, is unsupported and based on stale evidence. There is a certain amount of overlap between his two claims, and the remand being ordered based on the first claim renders this second claim moot. The Court will therefore not address it further.

### V.  CONCLUSION AND ORDER

For the reasons set forth in this Opinion and Order, the Court **GRANTS** Plaintiff's motion for judgment on the pleadings (Doc. 7), **DENIES** the Commissioner's motion (Doc. 9), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

/s/ Terence P. Kemp
**United States Magistrate Judge**